**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| LARONA CARTER; NYCLETHA BYRD; LAVETTA SPARKS–WADE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| STATE OF INDIANA; and PAIGE MCNULTY, in her individual capacity, | ) ) ) ) |
| Defendants. | ) ) |

CAUSE NO.: 2:21-CV-256-PPS-JPK

**OPINION AND ORDER**

Presently before the Court is Plaintiffs' Motion For Leave To Amend Complaint. [DE 53].

For the reasons discussed below, the motion is denied without prejudice.

**BACKGROUND**

**B.   PROCEDURAL HISTORY**

**1.   THE INITIAL COMPLAINT**

Plaintiffs Larona Carter and Nycletha Byrd initiated this action by filing a complaint on August 20, 2021 alleging that they are African American citizens of Indiana and registered voters in Lake County, Indiana, and that their constitutional rights were violated when the Lake County Board of Election and Registration (LCBER) and the Distressed Unit Appeal Board (DUAB) authorized a public question to be placed on the November 3, 2020 ballot in Gary, Indiana, where Plaintiffs reside, own property, and/or are registered to vote. The public question was whether to raise taxes to provide funding for the Gary Community School Corporation (GCSC). [DE 1 ¶¶ 1-2, 6, 27-28]. The initial complaint alleged that the majority of voters approved the referendum to increase property taxes, but that the public question was illegally placed on the ballot by Dr. Paige

McNulty, the Emergency Manager of the GCSC, appointed to that position by the DUAB after the Indiana General Assembly designated the GCSC as a financially distressed political subdivision. *See* IC 6–1.1–20.3–6.8.

The initial complaint (and all subsequent filed and proposed complaints) alleges that Plaintiffs' federal constitutional rights to due process, equal protection, and free speech have been violated because, among other things: (1) the GCSC does not have a governing body that could legally authorize the placement of a public question on the ballot; (2) the DUAB and McNulty did not allow public comments regarding the tax referendum; (3) the GCSC is being treated differently from the Muncie Community School District (MCSC), another distressed school corporation, because of the racial make-up of the GCSC versus that of the MCSC; (4) the public referendum resulted in Plaintiffs being subjected to taxation without representation because the GCSC is under the control of the Emergency Manager and the DUAB, rather than a locally elected governing body; and (5) the requirement in IC 6–1.1–20.3–9.9 that a person wishing to appeal a decision by the Emergency Manager must include the signatures of at least 250 individuals residing in the GCSC community constitutes a prior restraint on Plaintiffs' right to free speech. [DE 1 ¶¶ 3-23, 87-90].

The initial complaint named the LCBER and the DUAB as defendants. It sought various declarations regarding the alleged constitutional violations, as well as an injunction against the enforcement of IC 6–1.1–20.3–9.9, an injunction removing the DUAB's decision-making authority over the GCSC, and an injunction mandating an election to convene a governing body for the GCSC with full authority over the school community.

The LCBER responded to the initial complaint by filing a motion to dismiss in which it argued the following: (1) the Court lacks subject matter jurisdiction over Plaintiffs' claims under

the Tax Injunction Act, 42 U.S.C. § 1341; (2) the complaint should be dismissed because the State of Indiana is an indispensable party but, under principles of sovereign immunity, that entity cannot be sued; and (3) the complaint fails to plausibly allege facts showing that any actions of the LCBER violated the First Amendment, or the Due Process or Equal Protection Clauses of the Fourteenth Amendment. [DE 20]. The DUAB filed a separate motion to dismiss in which it argued that it is a state entity and therefore entitled to sovereign immunity. The DUAB acknowledged that an exception to sovereign immunity exists where a suit seeks to enjoin state officials from ongoing violations of federal law. *See Ex parte Young*, 209 U.S. 123 (1908). But the DUAB argued that exception did not apply to the initial complaint because the DUAB is not a "state official." [DE 22 at 6-7].

## 2.   THE AMENDED COMPLAINT

Plaintiffs responded to the motions to dismiss filed by the LCBER and the DUAB by seeking leave to file an amended complaint. [DE 25]. The proposed amended complaint added some factual allegations, and also dropped the DUAB as a defendant. In the DUAB's place, Plaintiffs named the State of Indiana and McNulty as defendants. McNulty was named in her individual capacity only. The proposed amended complaint also added a third plaintiff, LaVetta Sparks-Wade, a parent of a student who attends the GCSC. [DE 31 ¶ 10].

LCBER—the only defendant named in the proposed amended complaint who had entered an appearance in the case at the time of Plaintiffs' proposed filing—opposed Plaintiffs' motion to amend. [DE 26]. While the motion to amend was still pending, however, Plaintiffs and the LCBER reached an agreement pursuant to which they filed a joint motion to allow the amended complaint to be filed, with the additional joint request that, once the amended complaint was filed, the Court would dismiss the LCBER from the case. [DE 29]. The Court granted the agreed motion [DE 30],

and then entered an order dismissing Plaintiffs' claims against the LCBER with prejudice [DE 33], leaving the two yet-to-be-served new parties—the State of Indiana and McNulty—as the only defendants in the case.

The currently operative Amended Complaint [DE 31] includes eight counts against the State of Indiana and two counts against McNulty, all brought pursuant to 42 U.S.C. § 1983. The counts against the State of Indiana include the following:

(1)    Count I—denial of equal protection and violation of right to no taxation without representation based on the November 3, 2020 public referendum;

(2)    Count II—violation of the First Amendment based on the 250–signature requirement in IC 6–1.1–20.3–9.9;

(3)    Count V—violation of the First Amendment based on the DUAB's refusal to allow public comments at a board meeting held on July 9, 2020;

(4)    Count VI—denial of equal protection primarily based on the Indiana General Assembly's elimination of the GCSC's governing body, and disparate treatment of the MCSC;

(5)    Count VII—denial of equal protection primarily based on the Indiana General Assembly's failure to repeal or end its designation of the GCSC as a distressed school corporation, and disparate treatment of the MCSC;

(6)    Count VIII—injunctive relief seeking the repeal of the state statutes related to the designation of the GCSC as a distressed political subdivision and elimination of the GCSC's elected governing body;

(7)    Count IX—*Monell* claim alleging state liability for the actions of McNulty; and

(8)    Count X—indemnification claim for the actions of McNulty.

The two counts against Defendant McNulty include the following:

(1)    Count III—violation of the First Amendment arising out of an event to support the public referendum held at the West Side Leadership Academy on September 10, 2020, where McNulty did not allow opposing views to be expressed;

(2)    Count IV—violation of the First Amendment arising out of a meeting of the GCSC Advisory Board on September 21, 2020, where McNulty stopped the

meeting and denied Plaintiff Carter the opportunity to ask questions regarding the finances of the GCSC.

Following the Court's dismissal of Plaintiffs' claims against the LCBER, the newly named defendants were served with the Amended Complaint, and each then filed a motion to dismiss. [DE 47, 49]. The State of Indiana's motion to dismiss argued that: (1) all of Plaintiffs' damages claims against it are barred by the Eleventh Amendment; (2) the *Ex parte Young* exception to Eleventh Amendment immunity only applies when the defendant is a state official, not the state itself; (3) Count IX is legally insufficient because *Monell* only applies when a plaintiff seeks to hold a municipality liable and the State of Indiana is not a municipality, and (4) Count X is unnecessary because the State of Indiana's indemnification of public officials for acts within the scope of their employment is automatic. [DE 50].

Defendant McNulty's motion to dismiss argued the following: (1) McNulty was appointed Emergency Manager by the DUAB, and the DUAB is a state entity; therefore, the State of Indiana is McNulty's employer, and therefore she is a state official entitled to immunity under the Eleventh Amendment; (2) Plaintiffs Byrd and Sparks-Wade lack standing to bring the free speech claims in Counts III and IV because they do not allege they attended the meetings at issue; and (3) McNulty is entitled to immunity from Plaintiffs' claims under IC 6–1.120.3–7.5(e) because the Amended Complaint affirmatively pleads that she was acting within the scope of her employment but does not plead that she acted with gross negligence or willful misconduct.[1] *See* [DE 48].

---

[1] Indiana law provides that the emergency manager is granted immunity from civil liability for an act or omission within the scope and arising out of the performance of duties prescribed by the DUAB, except with respect to an act or omission that constitutes gross negligence or willful misconduct. In addition, the emergency manager may be represented by the state attorney general in any legal action against him or her arising out of the exercise of his or her statutory powers, and, if the emergency manager prevails in a lawsuit in which he or she is represented by the attorney general, attorney's fees may be recovered from the losing party, which are then deposited in the state general fund. *See* IC. 6–1.1–20.3–7.5(e), (f).

### 3.    THE PROPOSED SECOND AMENDED COMPLAINT

On June 7, 2022, Plaintiffs once again responded to the pending motions to dismiss by filing a motion for leave to amend the complaint. [DE 53]. The proposed Second Amended Complaint purports to no longer sue the State of Indiana, and, in the State's place, names two new defendants: Justin McAdam, in his official capacity as the Chairman of the DUAB,[2] and Eric Holcomb, in his official capacity as Governor of the State of Indiana. Plaintiffs also seek to add class action claims on behalf of two classes: (1) all registered voters in the November 3, 2020 election in Gary, Indiana, where the public question was placed on the ballot; and (2) all property owners in Gary, Indiana, who are required to pay additional property taxes due to the passage of the referendum but are not allowed to have representation through a governing body. [DE 53-1 ¶¶ 40-41].

In response to Plaintiffs' motion to file the Second Amended Complaint, the State of Indiana and McNulty withdrew their motions to dismiss the Amended Complaint [DE 54], and filed briefs in opposition to Plaintiffs' motion to amend. [DE 56, 57]. Plaintiffs filed separate replies to Defendants' oppositions [DE 61, 62], and the motion to amend is now ripe for ruling.

### 4.    RELATED LITIGATION

Before proceeding to discuss Plaintiffs' motion to amend, the Court mentions one final background matter that provides further context for this case. In a precursor to the present lawsuit, Plaintiff Carter and another citizen of Gary, Indiana initiated an administrative complaint before the LCBER seeking, among other things, to declare the 2020 property tax referendum void. *See Buggs v. McNulty*, No. 2:20-cv-406-PPS-JEM, Second Amended Complaint (DE 4) (N.D. Ind.

---

[2] The proposed Second Amended Complaint alleges that McAdam is the President of the DUAB, but the State of Indiana's opposition to the motion to amend clarifies that McAdam's correct title is Chairman. [DE 57 at 2].

Nov. 2, 2020). The LCBER complaint named McNulty as a defendant, as well as Nicole Wolverton, the Chief Financial Officer of the GCSC, Kimberly Bradley, the Chief Academic Officer of the GCSC, and Michelle Fajman, the Director of the LCBER. *Id.*[3] The LCBER complaint ended up before this Court when the three GCSC defendants (McNulty, Wolverton, and Bradley) removed it pursuant to 28 U.S.C. § 1441. *See Buggs v. McNulty*, No. 2:20-cv-406-PPS-JEM, 2021 WL 321448 (N.D. Ind. Jan. 29, 2021). In an observation equally applicable to the complaints in this case, the Court in *Buggs* stated that, "although there are some fleeting references to the U.S. Constitution, what is really at the core of this dispute is the manner in which the Gary Community School Corporation is financed, the perceived inequities in that process and the way the issue was placed before the electorate." *Id.* at *1. But the holding of *Buggs* is limited: the Court rejected the GCSC defendants' argument that the LCBER could be sufficiently characterized as a "state court" for federal removal purposes.[4] Accordingly, the Court remanded the case to the LCBER. *Id.* at *5.

Defendant McNulty references the *Buggs* case in asserting that "[t]his lawsuit is the latest installment in a multi-year challenge to the State of Indiana's efforts to address the 'dire financial issues' facing schools in Gary, Indiana, and the decision of Gary voters in 2020 to pass a referendum raising taxes to help those schools." [DE 56 at 1 (quoting *Buggs*)]. But McNulty does

---

[3] A previous complaint also named Lorenzo Arredondo, Lake County Circuit Court Clerk, and Justin McAdam, the Chairperson of the DUAB. *See Buggs, supra,* Amended Complaint (DE 3).

[4] *See Buggs,* 2021 WL 321448, at *3 ("The relief requested in Plaintiffs' Amended Complaint is specific to the [LCBER] and adjudicating this matter in front of a state or federal court as an initial matter would be inappropriate. Plaintiffs want the [LCBER] to void the results of the referendum, declare that an advisory board is not a governing body per the statute, declare the CFA-4 report [detailing receipts and expenditures of a political committee] defective, and establish that the GCSC Defendants violated election laws and constitutional rights. When examining the functions, powers, and procedures of the [LCBER], it is clear that the [LCBER] is a specialized administrative agency that cannot be considered a court for removal purposes.").

not explain what happened with the LCBER administrative complaint after she removed it and then this Court remanded it back to the LCBER nor discuss any impact her improper removal had on those proceedings. For their part, Plaintiffs state only that McNulty's "[im]proper … [re]mov[al] … to federal court … caused an over three-month delay before it could get back to the [LCBER] so that the matter could be heard and concluded," and that Plaintiffs have "resolved the issues with the [LCBER]." [DE 61 at 3]. Plaintiffs also contend that they seek to amend their complaint in this case now that the LCBER administrative matter has been resolved, and further, that McNulty provided testimony under oath in the LCBER administrative matter regarding how resources were used by the GCSC to promote the referendum, which testimony, they contend, further supports their constitutional claims in this case. [*Id.* at 4].

## DISCUSSION

### A.   STATUTORY LANDSCAPE

Before tackling the parties' arguments regarding the motion to amend, the Court finds it helpful to review the state statutes that are intertwined with those arguments.

#### 1.   CHAPTER 20.3—GENERAL PROVISIONS

In 2007, the Indiana General Assembly passed a statute providing for state takeover of "distressed political subdivisions," including distressed school corporations. *See* Chapter 20.3, Article 1.1, Title 6 of the Indiana Code ("Chapter 20.3"); *see also* IC 6–1.1–1–12 (defining a "political subdivision" to include a school corporation). Among other things, Chapter 20.3 created the DUAB,[5] a state entity consisting of five voting members all of whom report directly or

---

[5] The Court is told that the DUAB was originally called the "circuit breaker board," but was renamed the distressed unit appeal board in 2008. *See* [DE 22 at 2 n.1].

indirectly to the Governor.[6] The DUAB has the authority to determine whether a political subdivision is distressed. IC 6–1.1–20.3–4. The process is initiated when a petition to designate the political subdivision as distressed is filed with the DUAB by (1) the fiscal body and the executive of a political subdivision jointly; (2) the governing body or the superintendent of a school corporation; or (3) the treasurer of state if he or she believes that a school corporation is not able to pay its debt service obligations as they become due. IC 6–1.1–20.3–6(b) and (c). If the DUAB finds that one of the enumerated financial conditions apply to the political subdivision, it then makes the designation. IC 6–1.1–20.3–6.5(a). The DUAB's designation of distressed status is subject to judicial review under the terms set forth in IC 6–1.1–20.3–10.

Upon making a distressed designation, the DUAB must appoint an emergency manager for the distressed political subdivision. The emergency manager "serves at the pleasure of the board," and his or her activities are overseen by the chairperson of the DUAB. IC 6–1.1–20.3–7.5(b), (c). The emergency manager is deemed to be "acting on behalf of the distressed political subdivision," however, "and not the state," IC 6–1.1–20.3–7.5(b), and his or her compensation is typically paid by the distressed political subdivision, IC 6–1.1–20.3–7.5(d).

The emergency manager "assume[s] and exercise[s] all of the power, authority, and responsibilities of both the executive and the fiscal body of the political subdivision during the time the political subdivision is a distressed political subdivision," including, among other listed items, "[a]dopting … resolutions  relating to or affecting the fiscal stability of the political subdivision," with the caveat that "the emergency manager may impose only those taxes or fees

---

[6] The five voting members of the DUAB include the following state officials or their designees: (1) the director of the office of management and budget; (2) the commissioner of the department of local government finance; (3) the state examiner of the state board of accounts; (4) the secretary of education; and (5) an individual appointed by the governor. *See* IC 6–1.1–20.3–4(b).

that the political subdivision is authorized by law to impose." IC 6–1.1–20.3–8.5(b)(1). Other powers include implementing labor force reductions, outsourcing services performed by employees of the distressed political subdivision, reducing or suspending salaries of the political subdivision's employees, selling assets of the political subdivision, closing facilities of the distressed political subdivision, and, if the distressed political subdivision is a school corporation, requesting a loan from the counter-cyclical revenue and economic stabilization fund.[7] IC 6–1.1–20.3–8.5(b)(7), (8), (10), (12), (13), (19). The duties of the emergency manager include: reviewing the political subdivision's budget; conducting a financial and compliance audit of the political subdivision's internal operations; reporting and making recommendations to the DUAB regarding a comprehensive long term plan for paying all the political subdivision's outstanding obligations; submitting a monthly written report to the DUAB concerning the progress made toward removing the political subdivision from distressed status; and, if the distressed political subdivision is a school corporation, reporting and making recommendations to the DUAB regarding matters such as the school corporation's geographic boundaries, transportation needs, and governing structure. IC 6–1.1–20.3–8.5(c)(1), (2), (3)(B), (4)(A), (B), (G), (5)(C).

Once a school corporation is designated as a distressed political subdivision, certain restrictions on the activities of the school corporation kick in. For instance, the school corporation may not, without the approval of the DUAB, acquire real property for school building purposes, construct new school buildings or remodel or renovate existing school buildings, or adopt or

---

[7] *See* IC 6–1.1–20.3–8.3 ("After the [DUAB] receives a petition concerning a school corporation … the [DUAB] shall review the school corporation's request for a loan from the counter-cyclical revenue and economic stabilization fund under IC 6–1.1–21.4–3(b). The [DUAB] shall make a recommendation to the state board of finance regarding the loan request. The [DUAB] may consider whether a school corporation has attempted to secure temporary cash flow loans from the Indiana bond bank or a financial institution in making its recommendation.").

advertise a budget, tax levy, or tax rate for an ensuing budget year. IC 6–1.1–20.3–8.7. During the period in which a school corporation is designated a distressed political subdivision, the governing body of the school corporation may not meet more often than once every six months, but this limit does not apply to a meeting of the emergency manager. IC 6–1.1–20.3–16(a).

The DUAB must review a distressed designation annually to determine if the distressed political subdivision continues to meet the conditions for distressed status. IC 6–1.1–20.3–6.5(b). The DUAB must terminate the political subdivision's status as a distressed political subdivision if it finds the statutory conditions for that designation are no longer applicable to the political subdivision and the conditions listed in IC 6–1.1–20.3–13(b)(1) are met. Under certain circumstances, the executive of a distressed political subdivision may petition the DUAB to suspend the political subdivision's distressed status for a period of 180 days. IC 6–1.1–20.3–13(d). The emergency manager has the power, duty, and authority to petition the DUAB to terminate the political subdivision's status as a distressed political subdivision when the requirements for termination are met, IC 6–1.1–20.3–8.5(b)(20), and, when he or she does so, the DUAB must conduct a public hearing on the question. IC 6–1.1–20.3–13(a).

## 2. 2017 SPECIAL LEGISLATION—AMENDMENTS TO CHAPTER 20.3

In April 2017, the Indiana General Assembly determined that it was "necessary to address the unique issues faced by" two Indiana school corporations—the GCSC and the MCSC. IC 6–1.1–20.3–6.8(b)(1); IC 6–1.1–20.3–7.1(b)(1). Accordingly, the General Assembly amended Chapter 20.3 by adding section 6.8, applicable only to the GCSC, and section 7.1, applicable only to the MCSC. Both sections state that they are "not precedent for and may not be appropriate for addressing issues faced by other school corporations." IC 6–1.1–20.3–6.8(b)(2); IC 6–1.1–20.3–7.1(b)(2). Section 6.8 designates the GCSC as a distressed political subdivision for purposes of Chapter 20.3 without the need for a petition to be filed with the DUAB or a decision by that body,

11

while section 7.1 acknowledges that the MCSC already had been designated as a distressed political subdivision by the DUAB effective January 1, 2017. IC 6–1.1–20.3–6.8(a); IC 6–1.1–20.3–7.1(a). Both sections provide that, notwithstanding the contrary provision applicable to distressed political subdivisions generally, the DUAB shall determine the compensation of the emergency manager, pay his or her compensation, and reimburse him or her for expenses from funds appropriated to the DUAB. IC 6–1.1–20.3–7.1(c); IC 6–1.1–20.3–6.8(e)(3). In addition, the General Assembly provided that the DUAB may recommend to the state board of finance that it make an interest free loan to the MCSC and the GCSC from the common school fund,[8] and that the state board of finance may, notwithstanding IC 20-49, make the loan for a term of not more than ten years. IC 6–1.1–20.3–6.8(g)(2); IC 6–1.1–20.3–7.1(d).

Section 7.1 includes only the above provisions, while section 6.8 goes beyond them. Section 6.8 discusses the power, duties and responsibilities of the emergency manager (appointed pursuant to section 7.5 of Chapter 20.3), which include "the powers and duties specified in this chapter." IC 6–1.1–20.3–6.8(e)(1). Among other things, the emergency manager is tasked with adopting an annual budget, which must be approved by the DUAB and "must dedicate a significant part of the school corporation's budget to eliminating the school corporation's outstanding financial obligations." IC 6–1.1–20.3–6.8(l), (m). The emergency manager must hold a monthly forum to provide an update on the GCSC within the school district that is open to the general public. *Id.*

Section 6.8 contains several references to an "advisory board," providing among other things that "[u]ntil the school corporation's designation as a distressed political subdivision is terminated as provided in section 13(b) of this chapter, the advisory board may not hold a public

---

[8] *See* Title 20, Article 49 of the Indiana Code.

meeting more often than once every three (3) months." IC 6–1.1–20.3–6.8(d). In addition, section 6.8 directs the emergency manager to employ a chief financial officer and a chief academic officer, both of whom must make quarterly reports to the DUAB, as well as to the advisory board. IC 6–1.1–20.3–6.8(i), (j), (o), (q). The chief academic officer is tasked with developing an education plan to provide academic services to students in the school corporation and to achieve academic progress. IC 6–1.1–20.3–6.8(q). In addition, section 6.8 establishes a fiscal management board, which consists of four members—one appointed by the advisory board, one appointed by the mayor of the city of Gary, one appointed by the secretary of education, and one appointed by the state board of education. IC 6–1.1–20.3–6.8(g). The fiscal management board serves as a liaison to and works jointly with the DUAB, the mayor of the city of Gary, and the department of education, to develop a transition plan to address issues or questions related to the designation of the GCSC as a distressed political subdivision, the transfer of powers and duties to the emergency manager, and the potential impact of the transition on the community and the school corporation. IC 6–1.1–20.3–6.8(h)(4)(7). Section 6.8 makes clear that, although the emergency manager is directed to "consider recommendations from the fiscal management board and the advisory board, … the emergency manager has full responsibility and authority related to financial and academic matters of the school corporation, and the emergency manager may act, as specified in [Chapter 20.3], on these financial and academic matters without the approval of the fiscal management board or the advisory board." IC 6–1.1–20.3–6.8(e)(2). As discussed in the next section, the advisory board to which section 6.8 refers was established by amendments the General Assembly made to Title 20, Article 23, Chapter 12 in July 2018, that is, following the date on which section 6.8 took effect.

### 3.    2018 SPECIAL LEGISLATION—AMENDMENTS TO TITLE 20, ARTICLE 23

Not long after the above provisions were added to Chapter 20.3, the General Assembly amended Title 20, Article 23 of the Indiana Code relating to the organization of school corporations.

First, effective May 14, 2018, the General Assembly added Chapter 18, applicable only to the MCSC. The amendment states that if the Ball State University board of trustees adopts a resolution to take advantage of the relationship between Ball State University and the MCSC by June 1, 2018, and agrees to be governed by Chapter 18, then the DUAB will terminate the MCSC's designation as a distressed political subdivision by July 1, 2018. IC 20–23–18–1; IC 20–23–18–4. The amendment further provides that the MCSC "retains all the characteristics of a community school corporation," and that its governing body "has all the powers, rights, duties, and obligations of a community school corporation." IC 20–23–18–5. Beginning on July 1, 2018, however, the governing body of the MCSC is to consist of seven members who serve at the pleasure of the appointing authority, five of whom are appointed by the Ball State University board of trustees from individuals nominated by the President of Ball State University, and two of whom are appointed by the President of Ball State University, one from a list nominated by the Muncie city council and one from a list nominated by the mayor of Muncie. IC 20–23–18–6. From July 1, 2018 through June 20, 2020, the DUAB may provide financial support (not to exceed $1,000,000.00) to the MCSC in an amount that does not exceed the amount of compensation that would have been provided to an emergency manager if the MCSC had retained the designation of a distressed political subdivision. IC 20–23–18–13.

Second, Article 23 already included a chapter specific to the GCSC—Chapter 12—when the General Assembly passed legislation, effective July 1, 2018, creating the advisory board for that school corporation. Prior to the 2018 legislation, Chapter 12 provided for the election of the

GCSC's Governing Body. The July 1, 2018 legislation, however, amended Chapter 12 by transferring the power to act as a governing body from an elected board to the emergency manager appointed by the DUAB. *See* IC 20–23–12–3(a) ("The emergency manager appointed by the distressed unit appeal board under IC 6–1.1–20.3 shall act as the governing body of the school corporation [GCSC] and has the powers set forth in IC 6–1.1–20.3–8.5, including the powers and duties of the governing body of the school corporation."). At the same time, the new legislation provided that "[t]he school corporation shall also have an advisory board that consists of seven (7) members elected … [i]n a general election in the county." *Id.* The amended Chapter 12 establishes the qualifications for advisory board members, procedures governing election of advisory board members, term of office, etc., IC 20–23–12–3, *et seq*., but establishes no specific powers or duties for the advisory board. Instead, the legislation provides only that "[t]he advisory board is created to provide nonbinding recommendations to the emergency manager." IC 20–23–12–3(a).

## B.   LEGAL STANDARD

"[T]he decision to grant or deny a motion to file an amended pleading is a matter purely within the sound discretion of the district court." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008) (internal quotation marks and citation omitted). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Liu v. T&H Mach. Inc.,* 191 F.3d 790, 794 (7th Cir. 1999). "[T]his mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (citation omitted). Despite this liberal policy, however, "district courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to

the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008) (citing *Foman*).

Both Defendants McNulty and the State of Indiana argue futility as the primary reason why Plaintiffs' motion for leave to amend the Amended Complaint should be denied.[9] An amendment is futile when "the proposed amendment fails to cure the deficiencies in the original pleading, or could not survive a second motion to dismiss." *Crestview Vill. Apartments v. U.S. Dep't of Hous. & Urban Dev.*, 383 F.3d 552, 558 (7th Cir. 2004) (internal quotation marks and citation omitted). In this way, the "standard is the same standard of legal sufficiency that applies under Rule 12(b)(6)." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997). Federal Rule of Civil Procedure 12(b)(b) provides for dismissal of complaints that fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a claim for relief, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

---

[9] Plaintiffs argue that the State of Indiana has not shown undue prejudice or undue delay by Plaintiffs. [DE 62 at 3]. But the Court does not view the State of Indiana's brief in opposition to the motion to amend as making an undue prejudice or delay argument, so that issue will not be addressed.

C.   ANALYSIS

1.   DEFENDANT MCNULTY

Defendant McNulty argues that Counts III and IV of the proposed Second Amended Complaint alleging personal capacity claims against her for denial of free speech are futile because no Plaintiff claims to have attended the meeting on September 10, 2020 at issue under Count III, while only Plaintiff Carter attended the meeting on September 21, 2020 at issue under Count IV. According to McNulty, since "no Plaintiff claims to have attended th[e] [September 10, 2020 meeting] let alone to have tried unsuccessfully to express particular 'opposing views' at it[ ] …none … satisfies Article III standing," and the same standing defect applies to the claims of Plaintiffs Byrd and Sparks-Wade in Count IV, since there is no allegation that any plaintiff other than Carter attended the meeting on September 21, 2020. [DE 56 at 5,8]. McNulty also argues that both Counts III and IV fail to state plausible claims for denial of free speech, and that she is entitled to qualified immunity for both claims because Plaintiffs have not alleged facts sufficient to establish either a violation of a statutory or constitutional right or that the right was clearly established at the time of the challenged conduct. [*Id.* at 6-7, 8-10].[10]

The allegations in Counts III and IV of the proposed Second Amended Complaint are identical to the allegations in Counts III and IV of the Amended Complaint. A finding by this Court that Counts III and IV are futile would not result in the dismissal of the very same allegations in the Amended Complaint. McNulty would still need to raise the same arguments in a re-filed motion to dismiss the Amended Complaint, which would be decided by the presiding District

---

[10] A final argument that McNulty makes in opposition to Plaintiffs' motion to amend—futility as to the class certification allegations insofar as they relate to either Counts III or IV of the proposed Second Amended Complaint—will be considered separately later in this opinion.

Judge.[11] This means that any ruling with prejudice by the undersigned on the basis of futility would either have no practical impact or may go beyond the undersigned's authority by addressing matters of a dispositive nature. However, what is currently before the Court is simply a motion for leave to amend a complaint. The parties present a limited set of issues for the Court to decide in the briefing of this motion for leave to amend, and may well present additional arguments in relation to any subsequent motion to dismiss. With that in mind, the Court turns to Defendant McNulty's standing arguments.

The standing inquiry "asks whether a litigant is entitled to have a federal court resolve his grievance." *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004). Standing involves "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Defendant McNulty, in her motion to dismiss the Amended Complaint, focused on the constitutional minimum of standing, which flows from Article III's case-or-controversy requirement. *See* [DE 48 at 6-7]. But here perhaps the more salient issue is "the alternative threshold question whether [Plaintiffs] have standing to raise the rights of others."

---

[11] McNulty raised lack of standing as to Counts III and IV in her withdrawn motion to dismiss the Amended Complaint. But she did not raise at that time her current arguments in response to the motion to amend related to plausibility and qualified immunity. Instead, her withdrawn motion to dismiss argued dismissal on the basis of Eleventh Amendment immunity and statutory immunity under IC § 6–1.1–20.3–7.5(e). [DE 48 at 4-6, 7-8]. McNulty's statutory immunity argument was based on Plaintiffs' failure to allege intentional conduct or gross negligence, a failure that Plaintiffs have corrected in their proposed Second Amended Complaint. [DE 53-1 ¶ 21]. And McNulty has replaced her previous Eleventh Amendment immunity argument in her withdrawn motion to dismiss with a qualified immunity argument in her opposition to the motion to amend [DE 56 at 6-7, 9-10], likely because the Eleventh Amendment would not apply to Plaintiffs' individual capacity claims against her. *See Hafer v. Melo*, 502 U.S. 21, 29 (1991) (state officials acting under color of state law "are not entitled to absolute immunity for their official actions"; they are protected from personal liability for alleged constitutional violations only if they can show entitlement to qualified immunity (citing *Scheuer v. Rhodes*, 416 U.S. 232 (1974)).

*Kowalski*, 543 U.S. at 129 (citing *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 585 (1999)).[12]

The Supreme Court has explained the prudential standing requirement regarding the assertion of third-party rights as follows:

> We have adhered to the rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation. It represents a "healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed," the courts might be "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights[.]"
>
> We have not treated this rule as absolute, however, recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another. But we have limited this exception by requiring that a party seeking third-party standing make two additional showings. First, we have asked whether the party asserting the right has a "close" relationship with the person who possesses the right. Second, we have considered whether there is a "hindrance" to the possessor's ability to protect his own interests.
>
> We have been quite forgiving with these criteria in certain circumstances. "Within the context of the First Amendment," for example, "the Court has enunciated other concerns that justify a lessening of prudential limitations on standing." And "[i]n several cases, this Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties'

---

[12] To satisfy Article III, a party must demonstrate (1) an "injury in fact" ("an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical'"); (2) a causal connection between the injury and the conduct of which the party complains; and (3) that it is "likely" a favorable decision will provide redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992) (internal quotation marks omitted). The Court will assume for present purposes that Plaintiffs have or can allege facts that would support these elements insofar as their claims in Counts III and IV are concerned.

> rights." Beyond these examples—none of which is implicated
> here—we have not looked favorably upon third-party standing.

*Id.* at 129–30 (internal citations omitted, emphasis in original).

In response to Defendant McNulty's standing argument, Plaintiffs cite to the allegations in Count III that McNulty used school resources to market the referendum and denied the use of school resources for those with opposing views. [DE 61 at 4-5; *see* DE 53-1 ¶¶ 234-236]. According to Plaintiffs, these facts show that they suffered an injury-in-fact caused by McNulty's conduct and redressable by a favorable decision. But Count III also alleges "[t]hat on or about September 10, 2020, McNulty allowed an event to be held at West Side Leadership Academy to support the referendum," and "[t]hat McNulty did not allow opposing views" at that event. [DE 53-1 ¶¶ 232-233]. In other words, while Count III refers to McNulty's use of school resources, it also appears to be making a free speech claim based on the allegation that McNulty did not allow persons who attended the September 10, 2020 meeting to voice opposing views. And Plaintiffs have not provided any response to McNulty's standing argument with respect to that free speech claim. Therefore, the Court infers that Plaintiffs concede McNulty's standing argument insofar as Count III is interpreted as seeking to allege a free speech claim based on McNulty denying Plaintiffs the right to speak at the meeting. If instead Plaintiffs' intent in Count III is to assert a constitutional claim based on the use of school resources to market the referendum, which might include a factual allegation that McNulty allowed school facilities to be used for a meeting to support the referendum but not for purposes of opposing it, they should plead that claim more clearly so that McNulty has notice of what the claim is. McNulty apparently understood Count III differently, and accordingly, she has not at this time raised any argument as to whether Plaintiffs have standing to assert a First Amendment claim on the basis of factual allegations regarding use

of school resources, or whether those allegations plausibly state a claim for a constitutional violation. Accordingly, those questions are not currently before the Court.

With respect to Count IV, Plaintiffs do not respond to McNulty's standing argument regarding Plaintiffs Byrd and Sparks-Wade and the September 21, 2020 meeting. The "Wherefore" clause in Count IV of the proposed Second Amended Complaint, however, continues to demand judgment against McNulty on behalf of "Plaintiffs" rather than just Plaintiff Carter. The expansive "Wherefore" clause, accordingly, is defective.

McNulty also argues that Count IV of the proposed Second Amended Complaint is futile as to Plaintiff Carter because Plaintiffs have not alleged a plausible First Amendment violation. [DE 56 at 8-9]. "A school board meeting, when opened to the public, is a limited public forum for discussion of subjects relating to the operation of the schools." *Featherstone v. Columbus City Sch. Dist. Bd. of Educ.*, 92 F. App'x 279, 282 (6th Cir. 2004); *see also Barrett v. Walker Cty. Sch. Dist.,* 872 F.3d 1209, 1214 (11th Cir. 2017); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010); *Prestopnik v. Whelan*, 83 F. App'x 363, 365 (2d Cir. 2003). "When a school board sits publicly to conduct public business and to hear the views of citizens, it may not discriminate among speakers on the basis of the content of their speech, although it may confine its meeting to specified subject matter. Furthermore, the government may place limitations on the time, place, and manner of access to such forums, so long as the restrictions are content neutral and narrowly tailored to serve a significant governmental interest." *Featherstone,* 92 F. App'x at 282 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983)); *see also Stevens v. Sch. City of Hobart, No.* 2:13-CV-336-PRC, 2015 WL 4870789, at *14 (N.D. Ind. Aug. 6, 2015); *Ritchie v. Coldwater Cmty. Sch.*, No. 1:11-CV-530, 2012 WL 2862037, at *9 (W.D. Mich. July 11, 2012).

The only factual allegation in Count IV is that "McNulty stopped the [advisory board] meeting and denied Mrs. Carter the opportunity to ask questions regarding the finances of the Gary Community School Corporation." [DE 53-1 ¶ 238]. "The First Amendment generally permits the government to exclude a topic from discussion in such a limited public forum [as a school board meeting], provided that exclusion is viewpoint neutral and reasonable." *Prestopnik,* 83 F. App'x at 365 (citing *Perry Educ. Ass'n*, 460 U.S. at 46). Plaintiff Carter has not alleged that McNulty denied her the opportunity to ask questions because of her viewpoint. *Compare Ritchie,* 2012 WL 2862037, at *9 (holding that the plaintiff's allegations "that as he spoke during the public comment portion of the [school board] meeting, [he was] … interrupted [ ] and cut [ ] off based on the content of his message … suffice to allege a violation of [the plaintiff's] First Amendment rights" (citing *Steinburg v. Chesterfield Cty. Planning Comm'n*, 527 F.3d 377, 387 (4th Cir. 2008) (noting that a plaintiff may challenge even a facially valid policy against personal attacks if the policy is used to chill or silence speech in a given circumstance))). Nor has Plaintiff Carter alleged that any content-based restriction that was applied to her was not applied equally to all those at the meeting, i.e., that it was not "viewpoint neutral," or that the reasons McNulty cut her off were not related to legitimate governmental time, place, and manner restrictions placed on speech during an advisory board meeting. The sole factual allegation that Plaintiff Carter was not allowed to speak at the meeting is not sufficient for the Court to plausibly infer that her First Amendment rights were violated.[13]

---

[13] Given that the Court finds that Count IV of the proposed Second Amended Complaint does not state a plausible First Amendment claim, the Court need not address McNulty's additional argument that she is entitled to qualified immunity for that claim, although the Court notes that "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) ("Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate: [T]he plaintiff is

2.    STATE OF INDIANA

The State of Indiana argues that Plaintiffs' proposed "amendment would be futile because it does not look like the plaintiffs have stated a claim for which relief can be granted." [DE 57 at 1]. The entirety of the State of Indiana's futility argument, however, is the single sentence that "[a]mendment would be futile because the amendment, although it drastically changes the types of claims the plaintiffs bring, still doesn't appear to state a clam upon which relief can be granted." [*Id.* at 3]. The State of Indiana's conclusory, one–sentence discussion of futility is insufficient to raise an argument in opposition to Plaintiffs' request to amend. "It is not the obligation of th[e] court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Riley v. City of Kokomo, Ind. Hous. Auth.*, 909 F.3d 182, 190 (7th Cir. 2018) (quoting *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988)). To the extent that the State is making a vague reference to previous arguments for dismissal in its withdrawn motion to dismiss, the State failed to even express an intention to incorporate those arguments in its opposition to the motion to amend.

The State further argues, however, that "[t]here are an inordinate number of problems with the proposed complaint, but it is so vague and ambiguous that it is nearly impossible to catalog those problems." [DE 57 at 3]. The State mentions a few of the problems in passing, but does not attempt to provide a complete review or in-depth analysis of any defect in the proposed Second Amended Complaint, apparently on the belief that *Chapman v. Yellow Cab Cooperative*, 875 F.3d

---

not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." (internal quotation marks and citation omitted)).

846 (7th Cir. 2017), requires the State to file a Rule 12(e) motion for a more definite statement[14] rather than make futility arguments or file a motion to dismiss under Rule 12(b)(6). *See* [DE 57 at 3 ("If the Court permits amendment, a motion under Federal Rule of Civil Procedure 12(e) would be an appropriate next step.")].

It is not clear why the State filed an opposition to the motion to amend if it believed that the only way it could attack the proposed Second Amended Complaint was by a Rule 12(e) motion rather than a motion under Rule12(b)(6). But in any case, the Court disagrees with the State's interpretation of *Chapman*, which dealt with a ruling dismissing a complaint with prejudice, not with a ruling denying leave to file an amended pleading. Unlike in *Chapman*, a ruling by this Court denying leave to amend would not result in a dismissal of Plaintiffs' claims with prejudice.[15] And nothing in *Chapman* would require the Court to permit the filing of a proposed amended complaint that was so deficient that a Rule 12(e) motion for a more definite statement would be required.

---

[14] Federal Rule of Civil Procedure 12(e) provides that a "party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague and ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).

[15] The district court in *Chapman* dismissed all of the plaintiffs theories except one that required the plaintiff to prove that he was an employee of the defendant. 875 F.3d at 847. As to that theory, the district court directed the plaintiff to file an amended complaint. *Id.* The plaintiff did so, but the district court dismissed it as well, concluding that the plaintiff still had not provided sufficiently "detailed and thorough allegations" regarding all of the factors identified in controlling Seventh Circuit case law "as potentially relevant to the distinction between an employee and an independent contractor." *Id.* at 847, 848. The court ordered the plaintiff to file another amended complaint, which the court then dismissed with prejudice stating that the plaintiff still had not addressed all of the relevant factors. *Id.* at 848. The Seventh Circuit held that, "[t]o the extent the district court demanded that complaints plead facts—not only facts that bear on the statutory elements of a claim, but also facts that bear on judicially established standards—it was mistaken. … Because complaints need not identify the applicable law, … it is manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each." *Id.*

At least one of the motivating reasons why Plaintiffs seek leave to amend the Amended Complaint appears to be for purposes of naming new defendants for their official capacity claims, as past defendants—i.e., the DUAB and the State of Indiana—have repeatedly raised arguments specific to them for why they were not properly named. "Justice is certainly furthered by allowing a plaintiff to amend its complaint in an effort to identify the proper defendant, particularly where the motion to amend is timely and the lawsuit is still in its early stages." *Schram v. Fid. Nat'l Title Co.,* No. 1:15-CV-00131-SLC, 2015 WL 8773436, at *2 (N.D. Ind. Dec. 14, 2015). Denying a motion for leave to amend is generally disfavored, *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010), where, as here, the amendment, though not the first, is offered at the early stages of the proceedings before a scheduling order has been put in place and discovery has begun. "Where it is clear that the defect cannot be corrected so that amendment is futile, it might do no harm to deny leave to amend and to enter an immediate final judgment." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015). But the Seventh Circuit has said that "cases of *clear futility* at the outset of a case are rare." *Id.* (emphasis added). The Seventh Circuit recently reiterated this point, stating that "a court should deny leave to amend only if it is *certain* that amendment would be futile or otherwise unwarranted." *Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022) (emphasis added). A proffered amendment can be found futile where it "suffer[s] from … *obviously incurable* defects." *Id.* (emphasis added). Where the defect is more in the nature of a formal one that is curable by amendment, "[t]he federal policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure [the] formal defect in his pleading." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) (quoting 5A

25

Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)).

In keeping with this Seventh Circuit jurisprudence on the futility of amendments, the Court addresses below both incurable defects and potentially curable deficiencies in the proposed Second Amended Complaint that counsel against allowing Plaintiffs to file that complaint.

### a.   Sovereign Immunity Issues

The State argues that "it is impossible to figure out what relief the plaintiffs are asking for and who they're asking the Court to provide the relief." [DE 57 at 3]. For instance, the State points out that, throughout the proposed Second Amended Complaint, Plaintiffs ask for the Court to grant relief from "defendant" State of Indiana [*id.* (citing DE 53-1, pp. 37, 40, 41, 45, 48)], but the proposed Second Amended Complaint no longer names the State of Indiana as a party. The Court agrees that at least in this respect, the proposed Second Amended Complaint is clearly deficient. The "Wherefore" clauses in the six out of ten counts in the proposed Second Amended Complaint (including the count seeking injunctive relief), contain a plea for relief against the State of Indiana. It makes no sense for Plaintiffs to drop the State of Indiana as a defendant and then purport to seek relief from that defendant in the body of the complaint.

But more importantly, seeking relief of any kind directly from the State of Indiana is "clear[ly] futil[e]" because the State of Indiana is entitled to sovereign immunity under the Eleventh Amendment.[16] *See Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011) ("Sovereign immunity is the privilege of the sovereign not to be sued without its consent.");

---

[16] The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

*Council 31 of the Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 881 (7th Cir. 2012) ("[A]lthough not explicitly provided for in the text, the Eleventh Amendment guarantees that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." (internal quotation marks and citation omitted)).

There are three exceptions to Eleventh Amendment immunity: waiver, congressional abrogation, and the *Ex parte Young* doctrine. *Council 31*, 680 F.3d at 882. The State of Indiana has not consented to suit, and there is no abrogating federal statute on point.[17] The only potentially relevant exception to state immunity is under the *Ex parte Young* doctrine, which "allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *Id.* (quoting *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000) (citations omitted)). "There is a longstanding rationale that underlies this doctrine: [B]ecause an unconstitutional legislative enactment is void, a state official who enforces that law comes into conflict with the superior authority of the Constitution, and therefore is stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Id.* (internal quotation marks omitted) (quoting *Va. Office for Prot. & Advocacy*, 563 U.S. at 254 (quoting *Ex parte Young*, 209 U.S. at 159–60)). But the *Ex parte Young* doctrine only permits injunction suits against *state officials* who act unconstitutionally in their official capacities—it does not allow suits of any kind against the state itself. *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("Unless a State has waived its Eleventh Amendment immunity or

---

[17] Congress did not abrogate Eleventh Amendment immunity by enacting 42 U.S.C. § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. … That Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal–state balance in that respect was made clear in our decision in *Quern* [*v. Jordan*, 440 U.S. 332, 346 (1979)].").

Congress has overridden it, … a State cannot be sued directly in its own name regardless of the relief sought." (citing *Alabama v. Pugh*, 438 U.S. 781 (1978) (per curiam)); *see also Estate of Wobschall by Wobschall v. Ross*, 488 F. Supp. 3d 737, 751 (E.D. Wis. 2020).

Perhaps the Wherefore clauses of the proposed Second Amended Complaint are merely typographical errors that Plaintiffs would correct by replacing the State of Indiana with Governor Holcomb and/or Justin McAdam. Even so, Plaintiffs' *damages* claims,[18] whether alleged against the State of Indiana *or* against Governor Holcomb and/or McAdam, are barred by the Eleventh Amendment. The Seventh Circuit has said that this principle of law is "so well established that it needs no further discussion." *Hearne v. Bd. of Educ. of the City of Chi.*, 185 F.3d 770, 776 (7th Cir. 1999) ("The district court correctly noted that neither the State of Illinois, (former) Governor Edgar in his official capacity, nor the IELRB could be sued for damages under 42 U.S.C. §§ 1981, 1982, or 1983."). Nevertheless, since the proposed Second Amended Complaint asserts damage claims against state officials in their official capacities, the Court will provide some additional explanation. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71 (internal citation omitted). Plaintiffs may not circumvent the Eleventh Amendment "by a mere pleading device" of naming a state official in his or her official capacity in place of the State itself. *Id.* Plaintiffs' claims against Governor Holcomb and McAdam

---

[18] *See* [DE 53-1 at 37 (requesting that "the Court issue judgment against the State ordering the State to refund Plaintiffs all additional monies paid in property taxes … [and] the Court issue a judgment and order the State to reimburse Plaintiffs any and all additional monies paid pursuant to the referendum and for the State of Indiana to pay all referendum taxes until a local school board is elected to represent Gary's citizenry"); *id.* at 40 ("demand[ing] judgment against State of Indiana, for compensatory damages, plus the costs of this action, [and] attorney's fees"); *id.* at 41 ("Plaintiffs demand a … judgment against Defendant State of Indiana, for compensatory damages …."); *id.* at 44 ("demand[ing] judgment against Defendant State for compensatory damages, plus the costs of this action, attorney's fees"); *id.* at 45 (same); *id.* at 48 (same).

are the equivalent of claims against the State of Indiana and the DUAB, respectively, and it is undisputed that the DUAB is a state entity. Therefore, Eleventh Amendment immunity prohibits damages claims against either Governor Holcomb or McAdam in their official capacities as well as damages claims directly against the State of Indiana.[19]

Relatedly, Plaintiffs' claims in the proposed Second Amended Complaint for injunctive relief regarding the return of property tax payments made pursuant to the purportedly illegal public referendum are also clearly barred by the Eleventh Amendment.[20] "[W]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)). For instance, in *Ford Motor Co. v. Department of Treasury of State of Indiana*, 323 U.S. 459 (1945), a non-resident foreign manufacturing corporation brought suit against officials of the State of Indiana seeking a refund of income taxes paid to the state on the ground that those taxes violated the Commerce Clause and Fourteenth Amendment of the Constitution. *Id.* at 461. The Supreme Court held that "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign

---

[19] *See, e.g., Moore v. Sec'y, Ind. Family & Soc. Servs. Admin.*, No. 3:16-CV-227, 2017 WL 993077, at *6 (N.D. Ind. Mar. 15, 2017) ("Official capacity suits for *damages* are treated as suits against the state and therefore not viable under section 1983[.]" (emphasis in original)); *Marks v. Indiana*, No. 1:15-CV-118, 2015 WL 4421338, at *2 (N.D. Ind. July 17, 2015) ("[T]he State of Indiana is an improper entity, as states are generally immune from suit under the Eleventh Amendment—including claims for monetary relief for payments already made, declaratory relief, and injunctive relief. This also applies to state officials sued in their official capacities for damages, such as Attorney General Greg Zoeller." (citations omitted)).

[20] Plaintiffs reaffirm that they seek a refund of property taxes from the State in their reply brief responding to the State of Indiana's opposition to the motion to amend. *See* [DE 62 at 5 ("Plaintiffs should be refunded the amount of property taxes they have had to pay while the Gary Community School Corporation is without a governing body.").

immunity from suit *even though individual officials are nominal defendants*." *Id.* at 464 (emphasis

added). Plaintiffs' request for injunctive orders against Governor Holcomb and McAdam to refund

or reimburse monies paid by Plaintiffs for property taxes as a result of the 2020 public referendum

seeks in essence[21] to compensate Plaintiffs for past injuries, and therefore the proposed injunction

is barred even though it is styled as a request for injunctive relief and even though a state official

is the named defendant. *See Papasan v. Allain*, 478 U.S. 265, 278 (1986) (holding that the Eleventh

Amendment bars relief that "is tantamount to an award of damages for a past violation of federal

law, even though styled as something else"). Further, the same rationale bars any declaratory relief

Plaintiffs might be seeking concerning their entitlement to a refund of taxes paid pursuant to the

public referendum. *See MSA Realty Corp.*, 990 F.2d at 295 (holding that declaratory relief "should

not be awarded where the eleventh amendment bars an award of monetary or injunctive relief;

otherwise the [declaratory] relief would operate as a means of avoiding the amendment's bar");

*see also Council 31*, 680 F.3d at 884 (holding that the Eleventh Amendment barred "the entirety

---

[21] The Seventh Circuit has explained that "prospective relief of an ongoing federal violation will
often require state officials to dip into a state's treasury to comply with a court's order. Such an
ancillary effect on the state treasury is a permissible and often an inevitable consequence of the
principle announced in *Ex parte Young*. Nevertheless, where a plaintiff's request for relief would
have an effect upon the state treasury that is not merely ancillary but is the essence of the relief
sought, it is barred by the Eleventh Amendment." *Council 31*, 680 F.3d at 882–83 (quoting
*Edelman*, 415 U.S. at 668, and *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 293 (7th Cir. 1993)).
"Therefore, it is necessary to look not at the type of relief sought, but the effect the relief would
have on the State if it were afforded to the plaintiff." *Id.* at 883; *see MSA Realty Corp.*, 990 F.2d
at 295 ("merely labeling the relief sought as injunctive does not defeat the eleventh amendment
bar to suits that seek relief from the state treasury"). "There is [ ] no question that the 'essence of
the relief sought' [by Plaintiffs related to the public referendum] is the payment of funds out of the
treasury to the [property tax owners who paid those taxes]." *Council 31*, 680 F.3d at 884; *compare
Boler v. Earley*, 865 F.3d 391, 413 (6th Cir. 2017) (permitting a claim for injunctive relief ordering
the Governor to provide remedial services to those affected by the Flint water crisis, stating that
"[t]he primary purpose of [the] [requested] relief [was] not to cost the State of Michigan money,
but to provid[e] relief to the Plaintiffs through compensatory education, medical monitoring, and
evaluation services" (internal quotation marks and citation omitted)).

of [the plaintiff's] claim," including the plaintiff's request for declaratory relief, per the holding of *MSA Realty Corp.*).

In short, Plaintiffs' claims against the State of Indiana or any public official in his or her official capacity for refund of property taxes are both "clearly" futile and an "obviously incurable" defect.[22] On the other hand, the State of Indiana has not shown that Plaintiffs' claim for declaratory and/or injunctive relief related to the allegedly unconstitutional takeover of the GCSC by the State is clearly futile and/or an obviously incurable defect. "When challenging a state policy [under the *Ex parte Young* doctrine], the officer sued must 'have some connection' with the policy's enforcement or execution." *Gary B. v. Whitmore*, 957 F.3d 616, 631 (6th Cir. 2020) (quoting *Ex parte Young*, 209 U.S. at 157), *decision vacated and rehearing en banc granted*, Appeal Nos. 18-1855/1871 (6th Cir. May 19, 2020), *appeal dismissed as moot*, Appeal Nos. 18-1855/1871 (6th Cir. June 10, 2020). "Even when a function is administered on a day-to-day level by local officials, a state officer's supervisory authority can still make [him] a proper defendant under *Ex parte Young*. So long as the named defendants are 'actively involved' with the challenged conduct, they

---

[22] A claim against a public official in his or her individual capacity for actions personally taken by them with respect to the public referendum, which actions violated Plaintiffs' constitutional rights, would not be barred by the Eleventh Amendment. But Plaintiffs do not seek to sue the two public officials newly named in the proposed Second Amended Complaint in their individual capacity. And, although Plaintiffs do purport to sue McNulty in her individual capacity and the proposed Second Amended Complaint contains allegations suggesting McNulty's personal involvement in the public referendum being placed on the ballot, Plaintiffs do not specifically name McNulty as a defendant in any claims other than Counts III and IV, the two free speech claims concerning the September 10, 2020 and September 21, 2020 meetings. It is true that, while the Amended Complaint made clear that McNulty was only being sued under Counts III and IV, that clarity is missing from the proposed Second Amended Complaint because Plaintiffs have omitted the designation of which defendants are being sued that previously appeared in the heading of each count. Any ambiguity regarding which claims are being alleged against which defendants resulting from this omission, however, is another reason for denying leave to file the proposed Second Amended Complaint.

can be sued for injunctive relief without implicating the Eleventh Amendment." *Id.* (citations omitted).

The State of Indiana argues that the Governor is "not [a] suitable defendant[ ]" for Plaintiffs' claim for injunctive relief. [DE 57 at 4]. But insofar as the allegedly unconstitutional takeover of the GCSC is concerned, the Court does not think it is *necessarily* true that the Governor could not be named as a defendant.[23] And even if the Governor himself is not an appropriate state official to sue under *Ex parte Young* for those claims, Plaintiffs have also requested to add Justin

---

[23] *Compare Papasan,* 478 U.S. at 282 n.14 ("The respondents further contend that the petitioners have not sued any state officials who could grant the relief requested. We note, however, that the respondent Secretary of State is, by state statute, responsible for 'general supervision' of the administration by the local school officials …. To the extent that the respondent Secretary of State is acting in a manner that violates the Equal Protection Clause, such actions may be enjoined under *Ex parte Young*." (internal citation omitted)); *Gary B. v. Snyder*, 329 F. Supp. 3d 344, 353-54 (E.D. Mich. 2018) (holding that the plaintiffs had adequately pleaded that the Governor and other state officials "effectively control the [Detroit] schools, at least in part," through "the selection and appointment of the emergency managers," who "'serve[d] at the pleasure' of the Governor"), *aff'd in relevant part sub nom*, *Gary B. v. Whitmer*, 957 F.3d at 632 ("The governor is the chief executive officer" and "while the state has delegated much of the management of individual school districts and schools to local authorities, these remain 'under the ultimate and immediate control of the state and its agents'" (citation omitted)); *Bd. of Sch. Directors of City of Milwaukee v. Wisconsin*, 649 F. Supp. 82, 98 (E.D. Wis. 1985) (holding that Eleventh Amendment precluded school desegregation claims seeking injunctive and declaratory relief against the State, but that those claims could proceed against the Governor and the Superintendent), *with Hearne*, 185 F.3d at 777 ("[T]he plaintiffs have not and could not ask anything of the governor that could conceivably help their cause. … [T]he governor has no role to play in the enforcement of the challenged statutes, nor does the governor have the power to nullify legislation once it has entered into force. Technically, therefore, it is not the Eleventh Amendment that bars the plaintiffs' action for prospective injunctive relief against the governor; it is their inability to show that he bears any legal responsibility for the flaws they perceive in the system."); *In re: Conditions at Lake Cty. Jail*, No. CV 22-127-M-DWM, 2022 WL 16636450, at *6 (D. Mont. Nov. 2, 2022) ("[T]he Governor's connection to the living conditions at a county detention facility is tenuous at best. Gianforte can neither unilaterally alter the exercise of PL 280 jurisdiction, … nor provide a specific remedy related to administration of the Lake County Jail." (citations omitted)); *Inclusive Cmtys. Project, Inc. v. Abbott*, No. 3:17-cv-440-D, 2018 WL 2415034, at *10 (N.D. Tex. May 29, 2018) ("The required connection is not merely the general duty to see that the laws of the state are implemented, but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." (internal quotation marks and citations omitted)).

McAdam. While Plaintiffs have not shown that McAdam, as Chairman of the DUAB, would be capable of according them any relief regarding the GCSC's status as a distressed school corporation without the involvement of the other members of the DUAB, that issue is not currently before the Court.[24]

### b.   COUNTS IX AND X—*MONELL* AND INDEMNIFICATION CLAIMS

Although the State of Indiana does not mention the arguments it raised in its motion to dismiss the Amended Complaint regarding Counts IX and X, the Court takes a moment to address those Counts since they are realleged in the proposed Second Amended Complaint, only naming Governor Holcomb and McAdam as defendants rather than the State of Indiana.

Section 1983 provides that any "person who, under the color of" law, causes a person to be deprived "of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. As previously discussed, a "suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will*, 491 U.S. at 71. "As such, it is no different from a suit against the State itself," and the Eleventh Amendment protects that official's office from suit. *Id.* In some cases, however, a municipality may be sued for damages under section 1983 if there is evidence of a widespread policy or custom that is the "moving force" behind the constitutional rights violations. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). However, *Monell* liability only applies to "local governing bodies,"—not to state agencies, which do not qualify as "persons" for

---

[24] Complete relief from this alleged constitutional violation also might require the involvement of McNulty, who is the Emergency Manager of the GCSC and plays a statutory role in termination of the GCSC's distressed status. But the proposed Seconded Amended Complaint fails to allege any official capacity claims against her.

the purposes of § 1983 relief. *Id.; Gleason v. Bd. of Educ. of City of Chi.*, 792 F.2d 76, 79 n.1 (7th Cir. 1986). Therefore, Count IX of the proposed Second Amended Complaint seeking to hold the State of Indiana through an official capacity claim against Governor Holcomb, and the DUAB through an official capacity claim against McAdam, liable for the allegedly unconstitutional actions of McNulty, is clearly deficient. *See, e.g., Est. of Wobschall by Wobschall*, 488 F. Supp. 3d at 751–52. The same reasoning applies to Count X, which seeks indemnification from the State of Indiana through an official capacity claim against Governor Holcomb, and from the DUAB through an official capacity claim against McAdams, for constitutional injuries caused by McNulty referencing the legal requirements for *Monell* liability. *See Joseph v. Bd. of Regents of the Univ. of Wisc. Sys.*, 432 F.3d 746, 748-49 (7th Cir. 2005) ("*Monell's* holding applies only to municipalities and not states or states' departments." (citations omitted)).

### c.   PLAUSIBILITY ISSUES

Rule 8 requires that a complaint only include "a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). But nothing in the Seventh Circuit's opinion in *Chapman* eliminates the requirement that a complaint must plead sufficient factual content to render a claim plausible. That is, "[a] plaintiff needs to provide 'enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 664 (7th Cir. 2022) (quoting *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)). The proposed Second Amended Complaint for the most part does not satisfy this pleading standard because, in some respects, it asserts unsupportable legal theories, while in other respects, it alleges potentially supportable legal theories but fails to draw any plausible connection between the sprawling factual matters alleged and the legal theory applicable for each count.

(i)  CLAIMS RELATED TO THE PROPERTY TAX
REFERENDUM

Count I relates to Plaintiffs' complaints about the property tax referendum. The Count references the concepts of "Equal Protection Violations" and "Taxation Without Representation" in the title, but the paragraphs under the title reference instead the concepts of "procedural due process" and "substantive due process." Most of the allegations assert in a conclusory manner devoid of factual content that the identified constitutional provisions have been violated. The only factual content to support those conclusory allegations relates to alleged violations *of state law*.[25] "[R]egurgitated [state statutory] language cannot be the sum total of a plausible claim. Instead, it must be accompanied by factual allegations that support the elements of the claim and therefore give rise to a plausible inference that the plaintiff is entitled to relief." *Moore*, 2017 WL 993077, at *3. Furthermore, allegations that a state official has violated state law do not give rise to a claim for injunctive relief under the *Ex parte Young* doctrine. *See Lukaszczyk v. Cook Cty*., 47 F.4th 587, 604 (7th Cir. 2022) ("Individual state officials may be sued personally for federal constitutional violations committed in their official capacities, but that principle does not extend to 'claim[s] that state officials violated state law in carrying out their official responsibilities.'" (quoting *Pennhurst*, 465 U.S. at 121)). Plaintiffs' allegations, if true, are troubling. But if they amount to no more than state law violations, they do not belong in federal court.

---

[25] *See, e.g.,* [DE 53-1 ¶ 3 ("[O]n or about November 3, 2020, a public question regarding a referendum was placed on the ballot by Defendant McNulty and Defendant McAdam when there was no law signed by Defendant Holcomb which expressly authorized Defendant McNulty, or Defendant McAdam to place a public question regarding a referendum on the November 3, 2020 ballot."); *id.* ¶ 7 ("[T]here was no law drafted in Indiana expressly authorizing the governing body of the Gary Community School Corporation to seek a referendum while under state takeover."); *id.* ¶ 78 ("[A]t the time the public question was placed on the ballot, Defendants knew or should have known that there was no statute which expressly authorized the emergency manager of the Gary Community School Corporation to put a public question on the ballot regarding a referendum.")]; *see also* [*id.* ¶¶ 219–221, 223, 259, 290].

In addition, "the crux of Plaintiffs' complaint [about the property tax referendum] is not so much that they are forced to pay a tax, but they are forced to a pay a tax imposed by an unauthorized, unelected body, relying on the principle of 'no taxation without representation.'"[26] *Corr v. Metro. Wash. Airports Auth.*, 800 F. Supp. 2d 743, 755–56 (E.D. Va. 2011), *aff'd*, 740 F.3d 295 (4th Cir. 2014). Addressing similar allegations, the *Corr* court explained:

> There is no doubt that historically, protests against "taxation without representation" motivated the founding generation and certain values expressed in the United States Constitution. Without disagreeing with the broad sentiments expressed in Plaintiffs' position, the Court must also acknowledge that such a principle, as such, was not adopted in the federal Constitution and has not been enforced as such. Rather, Article I, § 8 confers on Congress the broad power "to lay and collect Taxes, Duties, Imposts and Excises;" and as the United States Supreme Court explained early in our history, this power is "general, without limitation ... extend[ing] to all places over which the government extends." *Loughborough v. Blake*, 18 U.S. (5 Wheat) 317, 318–19, 5 L. Ed. 98 (1820). Similarly, in *Heald v. District of Columbia*, the Supreme Court rejected the claim that a congressional tax on intangible personal property of persons residing or doing business in the District was unconstitutional because it subjects the residents of the District to taxation without representation. 259 U.S. 114, 124 (1922). The Court concluded "[t]here is no constitutional provision which limits the power of Congress that taxes can be imposed only upon those who have political representation." *Id.*

*Id.*[27]

---

[26] *See* [DE 53-1 at 35 ("Count I—42 U.S.C. § 1983 Claim For Violations of Equal Protection Violations Taxation Without Representation")].

[27] *See also Breakefield v. District of Columbia*, 442 F.2d 1227, 1228 (D.C. Cir. 1970) (where the D.C. Circuit considered and rejected a challenge to Congress's imposition of an income tax upon District residents); *Syfert v. City of Rome*, No. 6:19-cv-775 (GTS/ML), 2020 WL 4506689, at *9 (N.D.N.Y. Apr. 15, 2020) ("recommend[ing] that Plaintiff's taxation without representation claim be dismissed as frivolous"), *report and recommendation adopted*, No. 6:19-cv-775 (GTS/ML), 2020 WL 4500893 (N.D.N.Y. Aug. 5, 2020); *Adams v. Clinton*, 90 F. Supp. 2d 35, 54–55 (D.D.C.) (concluding that *Loughborough* and *Heald* are binding precedent), *aff'd*, 531 U.S. 941 (2000); *Greisdorf v. Governor, State of Fla.*, No. 6:15-cv-775-Orl-28KRS, 2015 WL 9243894, at *4 (M.D. Fla. Nov. 10, 2015) ("the federal constitution contains no right against 'taxation without representation'"), *report and recommendation adopted*, No. 6:15-cv-775-Orl-28KRS, 2015 WL

Nor is it likely that Plaintiffs' "taxation without representation" theory may be salvaged by their attempt to plead it as an equal protection claim. *See Ehm v. Bd. of Trs. of Metro. Rapid Transit Auth. of San Antonio*, 251 F. App'x 930, 931–32 (5th Cir. 2007) (rejecting argument that "the appointment of Board members rather than the general election of Board members by San Antonio citizens violates [the plaintiff's] rights under the Equal Protection Clause and the 'one person, one vote' principle arising under that Clause" because the Board was created by state statute "to perform essentially administrative rather than legislative functions"). To the extent that Plaintiffs are asserting a violation of "equal rights of citizens through taxation without representation, this claims fails as well." *Id.* The Emergency Manager on behalf of the GCSC "has the power to levy taxes only with the prior approval by a vote from [Gary] citizens." *Id.* Plaintiffs acknowledge in their complaint that the property tax referendum was passed by the voters in Gary. If a constitutional claim exists based on the alleged facts surrounding the placement of the referendum on the ballot, such a claim does not appear to be adequately pleaded in the proposed Second Amended Complaint. *See Quinn v. Bd. of Educ. of the City of Chi.*, 234 F. Supp. 3d 922, 933-34 (N.D. Ill. 2017) (dismissing complaint alleging that an Illinois statute authorizing an appointed school board to levy taxes violated constitutional due process by delegating the power to tax to an unelected entity, reasoning that the board's taxing authority was constrained under the statute by, among other things, the requirement "that any increase in annual rates must be submitted to the

---

9255337 (M.D. Fla. Dec. 17, 2015); *Doe v. Maximus*, No. 3:10–00412, 2010 WL 4861136, at *5 (M.D. Tenn. Nov. 15, 2010) ("There is no legal basis for Plaintiff's 'taxation without representation' claim."); *Hobson v. Tobriner*, 255 F. Supp. 295, 298 (D.D.C 1966) ("Residents of the District of Columbia have been subjected to taxation without representation and the Supreme Court has repeatedly upheld the power of Congress to pass such legislation."); *Campbell v. Hilton Head No. 1 Pub. Serv. Dist.*, 354 S.C. 190, 580 S.E.2d 137, 140 (2003) ("[W]hile the American Revolution may have been spurred on by the rallying cry 'no taxation without representation,' the federal Constitution that was subsequently drafted contained no express provision guaranteeing that as a right.").

voters of such district at any general or special election" and the fact that the board "remain[ed] indirectly accountable to Chicago residents and taxpayers for all of its actions through the popularly-elected mayor" [the appointing authority under the statute] (internal quotation marks and citation omitted)), *aff'd sub nom. Quinn v. Illinois*, 887 F.3d 322 (7th Cir. 2018).

**(ii)    EQUAL PROTECTION/DUE PROCESS CLAIMS
BASED ON SPECIAL LEGISLATION APPLICABLE
ONLY TO THE GCSC**

Some of Plaintiffs' claims appear to be based on the legal theory that Plaintiffs are denied equal protection and/or due process because the Indiana General Assembly replaced the GCSC's elected governing board with an unelected governing Emergency Manager, and that other school corporations in Indiana that also experienced financial distress, such as the MCSC, have not been treated similarly. Plaintiffs allege in a somewhat conclusory manner that these facts violate their constitutional rights to equal protection or due process under the laws.

In *Quinn v. Illinois*, 887 F.3d 322, the Seventh Circuit considered similar allegations in a suit brought by a group of registered voters in the City of Chicago challenging a 1995 Illinois statute that established an appointive process for selecting members for Chicago's Board of Education. *See Quinn*, 234 F. Supp. 3d at 925.[28] The plaintiffs' complaint alleged "that of the 859 public school districts in Illinois, only one—the district coextensive with Chicago's city limits—has a school board whose members are appointed, rather than elected." *Id.* The Seventh Circuit first rejected the plaintiffs' claim that the appointive process violated the Voting Rights Act, a

---

[28] The Illinois statute provided for the appointment of board members for the City of Chicago board of education by the Mayor of Chicago, whereas the Indiana statutes at issue here provide for the appointment of an Emergency Manager in place of a governing board by a state-created board (the DUAB), consisting of state officials appointed by the Governor. The Michigan statute at issue in the *Gary B.* and *Moore* cases, cited *infra* at note 33, has a structure more similar to the Indiana statute than the Illinois statute, involving a state board that appoints a manager to run the school in place of an elected school board.

claim not advanced by Plaintiffs here. 887 F.3d at 323-25. The plaintiffs' second theory however––that the appointive process violated the Equal Protection Clause of the Fourteenth Amendment––is similar to Plaintiffs' Equal Protection claims in this case.[29] As to the Illinois statute, the Seventh Circuit held that the plaintiffs' "equal–protection theory is brought up short by *Sailors v. Board of Education,* 387 U.S. 105 (1967), which holds that appointing a school board is constitutionally permissible,[[30]] and by *Hearne v. Board of Education*, 185 F.3d 770 (7th Cir. 1999), which holds that the 1995 Illinois statute is valid notwithstanding the line it draws between Chicago and every other city of Illinois." *Id.* According to the Seventh Circuit, "*Hearne* addresses and rejects the sort of racial-impact contention that plaintiffs pursue. This approach is just a repackaged version of the contention that some citizens have been disfranchised. We have explained why that is wrong: all citizens of Chicago have equal influence, though it is exercised indirectly (by voting for Mayor)

---

[29] As the district court in *Quinn* explained in greater detail, the plaintiffs' complaint "articulate[d] several species of equal protection violations. In Count I, [the] plaintiffs allege[d] that [the Illinois statute] violate[d] the Equal Protection Clause (as well as the First Amendment) by denying Chicago citizens the same right as other Illinois citizens to vote for members of the Board. In Count II, they claim[ed] that the statute violate[d] the Equal Protection Clause … because it authorize[d] an unelected Board to levy taxes. And in Count IV, [the] plaintiffs assert[ed] that [the Illinois statute] discriminate[d] against African–Americans by denying them the right to vote on account of their race in violation of the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment." 234 F. Supp. 3d at 928.

[30] *Sailor* involved a Michigan statute that provided that the county school board for Kent County, Michigan was chosen, not by the electors of the county, but by delegates from the local boards. 387 U.S. at 106. The Supreme Court rejected the argument that the appointment method of establishing a local school board violated the "the principle of 'one man, one vote'"; the court reasoned that "[p]olitical subdivisions of States—counties, cities or whatever—never were and never have been considered as sovereign entities. … [T]hese governmental units are created as convenient agencies for exercising such of the governmental powers of the state, as may be entrusted to them, and the number, nature and duration of the powers conferred upon (them) * * * and the territory over which they shall be exercised rests in the absolute discretion of the state." *Id.* at 107-08. The Court concluded that "nothing in the Constitution" prevented the State from establishing a system by which non–legislative officers, such as members of a county school board, are appointed by the State rather than elected. *Id.* at 111.

rather than directly (by voting for the Board's members). There is neither disparate treatment nor disparate impact—and, as *Hearne* observed, disparate impact does not violate the Equal Protection Clause at all." *Id.*; *see also Quinn*, 234 F. Supp. at 928-29 (holding that the Illinois statute was subject to the rational basis test rather than strict scrutiny because on its face it drew a legislative classification based on geographical or population criteria rather than racial criteria,[31] and finding that test easily satisfied). "[T]he Equal Protection Clause does not prohibit legislation merely because it is special, or limited in its application to a particular geographical or political subdivision of the state. Indeed, the Seventh Circuit has observed that the Illinois statute books are riddled with laws that treat Chicago differently from Illinois' smaller cities." *Id.* at 929 (quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 70-71 (1978), and *Hearne*, 185 F.3d at 774).

Plaintiffs attempt to base their equal protection claims in this case at least in part on the racial impact of the Indiana statutes at issue, similar to the arguments made by the plaintiffs in *Quinn*.[32] But their factual allegations and equal protection theory may run into this adverse, controlling authority, which holds that the disparate racial impact of such statutory schemes does not support a constitutional claim. *See Quinn*, 234 F. Supp. at 932 ("Numerous courts, including the Seventh Circuit …, have examined the propriety of education statutes that apply specifically to large, urban school districts and have uniformly acknowledged that the particular needs of these districts justifies a population-based legislative classification.").[33] If Plaintiffs decide to seek leave

---

[31] This is also true of the Indiana statutes at issue in this case. *See* IC 20–23–23–2 ("As used in this chapter, 'school corporation' means a school corporation that is located in a city having a population of more than sixty-nine thousand (69,000) and less than sixty-nine thousand five hundred (69,500)."); IC 6–1.1–20.3–6.8(a) ("This section applies only to the Gary Community School Corporation.").

[32] *See, e.g.,* [DE 53-1 ¶¶ 97, 99, 166, 179-181 195].

[33] *See also Gary B. v. Snyder*, 329 F. Supp. 3d at 366-69 (addressing constitutional challenges to same statutory scheme applicable to the Detroit schools that was previously upheld in *Moore* [see

to amend in the future, they must be prepared to address or distinguish this case law in explaining in their motion to amend how their proposed amendment plausibly alleges a constitutional violation.

### (iii)   CLASS ACTION ALLEGATIONS

Defendant McNulty argues that the request to amend the complaint to add class action allegations should be denied because Plaintiffs could have alleged class claims in either of the last two complaints and they do not "explain why doing so now is worth the substantial increase in complexity, expense, and burden." [DE 56 at 7]. Defendant McNulty also argues that Plaintiffs' claims are incompatible with the requirements for class certification, particularly the typicality and adequacy of representation requirements. [*Id.*]. The State of Indiana makes no arguments regarding the class action allegations in the proposed Second Amended Complaint.

---

below], and holding that, although the complaint in that case clearly established that the plaintiffs' schools "predominantly served children of color," it failed to state a claim under the Equal Protection Clause because it did not adequately plead that the government treated the plaintiffs disparately compared to similarly situated school districts), *aff'd in relevant part*, *Gary B. v. Whitmore*, 957 F.3d at 637 (finding that the plaintiffs "have not identified which state policy or action they are challenging as discriminatory, regardless of what comparator is used, and that, "[w]ithout this threshold allegation, their equal protection claim cannot survive," and further, that the plaintiffs' "conclusory statements that merely allude to race-based discrimination" were not sufficient to adequately plead disparate treatment based on race); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 354, 370-71 (6th Cir. 2002) (where state passed legislation providing for the appointment by the mayor of a seven-member school reform board in qualifying school districts of which there was only one—Detroit—and the board then appoints a CEO for the school district who serves at the will of the reform board with all the authority and duties of a school board, court holds on summary judgment that the statute was facially neutral and that, despite the uncontroverted fact that the statute had a substantial impact on African–American citizens, the plaintiff's allegations were insufficient to establish that an impermissible discriminatory purpose motivated the Legislature to enact it); *Mixon v. State of Ohio*, 193 F.3d 389, 403 (6th Cir. 1999) (applying rationale basis test to state statute providing for mayoral appointment of school board members in the city of Cleveland, stating that, "[a]lthough Plaintiffs have a fundamental right to vote in elections before them, there is no fundamental right to elect an administrative body such as a school board, even if other cities in the state may do so" (internal quotation marks and citations omitted)).

The proposed Second Amended Complaint does not specify whether it seeks class certification as to all counts or just some. Nor do Plaintiffs identify the subsection of Rule 23 under which they are seeking certification for each claim, that is, whether the claim may be certified under subsection (b)(1),[34] (b)(2),[35] or (b)(3).[36] To the extent any allegation alludes to a specific subsection of Rule 23, it merely mimics the language in the rule, without plausibly alleging how the facts of this case satisfy that language. Plaintiffs' allegations regarding the requirements set forth in subsection (a) of Rule 23 applicable to all three types of class actions—numerosity, commonality, typicality, and adequacy of representation—are similarly conclusory. And it is impossible to evaluate whether those criteria are plausibly alleged when they are not tied to any specific facts or legal theories, but instead are alleged generally as if they could apply to all ten counts of the complaint. For instance, if Plaintiffs' class allegations were intended to encompass the free speech claims related to specific meetings, Plaintiffs likely could not plausibly allege numerosity, among other required elements, for those claims. And if Plaintiffs are attempting to allege a (b)(2) class, their class allegations against McNulty as to any future conduct would not be

---

[34] A class action may be maintained under subsection (b)(1) if "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1).

[35] A class action may be maintained under subsection (b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

[36] A class action may be maintained under subsection (b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

appropriate without an official capacity claim against her. To the extent that Plaintiffs seek to represent a (b)(3) class, their class claims against McAdam and Governor Holcomb would be barred by the Eleventh Amendment, as previously discussed.

There are additional problems with the proposed Second Amended Complaint's class allegations as well. Those allegations reference "Defendant DUAB" when the DUAB is not a named defendant. *See* [DE 53-1 ¶ 65]. They also reference "Defendants IGA." [*Id.*]. Although the allegations do not identify "IGA," presumably that acronym refers to the Indiana General Assembly, which also is not a named defendant in the proposed Second Amended Complaint. Finally, a number of substantive claims in the proposed Second Amended Complaint are deficient, as discussed above, and it would only confuse matters to add class allegations those counts.

In short, the class allegations in the proposed Second Amended Complaint are alleged in such a manner that it is impossible for the Court to assess whether Plaintiffs can plausibly state class claims. The request to amend the complaint to allege class claims accordingly is denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to amend the Amended Complaint **[DE 53]** is **DENIED WITHOUT PREJUDICE**. While Plaintiffs are not required to file an additional motion to amend, if they choose to do so, they shall comply with the following:

1.      Any motion to amend must attach a revised proposed Second Amended Complaint in accordance with the Local Rule governing motions to amend.

2.      A red-lined version of the attached revised proposed Second Amended Complaint should also be attached, which shows how the proposed complaint differs from the currently operative Amended Complaint.

3.      The motion to amend must explain in detail, with citations to specific allegations, how the revised proposed Second Amended Complaint includes claims and defendants consistent with the legal authorities discussed in this order.

4.      The Court cautions Plaintiffs that the Court may choose to take additional factors into consideration in ruling on a future motion to amend, such as whether the party previously had an opportunity to amend or the burden on the defendants and the judicial system imposed when a party fails to correct previously identified deficiencies in the pleadings.

So ORDERED this 8th day of November, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT